UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE

Eastern District of Kentucky
F I L E D

AUG 0 2 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-376-GWU

NETTIE SLONE
O.B.O. GARY HERALD,                                                           PLAINTIFF

VS.                              MEMORANDUM OPINION

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY                          DEFENDANT

## INTRODUCTION

Nettie Slone appeals from the negative administrative decision on her son

Gary Herald's application for Child's Supplemental Security Income (SSI) benefits.

The case is before the Court on cross-motions for summary judgment.

## LAW APPLICABLE TO CHILD'S SSI BENEFITS

As of 1996 strict standards for child's SSI claims were adopted. The Welfare

Reform Act, P.L. No. 104-193, 110 Stat. 2105, provides that:

> An individual under the age of eighteen (18) shall be considered
> disabled for the purposes of this title if that individual has a medically
> determinable physical or mental impairment which results in marked
> and severe functional limitations, and which can be expected to result
> in death, or which has lasted, or can be expected to last for a
> continuous period of not less than 12 months.

Thus, a child's SSI claim can be granted now only if there is a "marked and severe

functional limitation(s)." The impairment must meet, medically equal, or functionally

1

Slone for Herald

equal in severity one of the Listing of Impairments found at 20 C.F.R. Part 404,
Subpart P, Appendix 2. 20 C.F.R. Section 416.924.

The implementing regulations require the agency to determine if the child's
impairment(s) meet any Listing of Impairments sections found at 20 C.F.R. Part
404, Subpart P, Appendix 1. 20 C.F.R. Section 416.924. If this step is not satisfied,
the fact finder is required to consider limitation of specific functioning, broad areas
of development or functioning, episodic impairments, and limitations related to
medication effects to determine "functional equivalence" to the LOI. Section
416.926a. Functional equivalence is established if the child has one area of
extreme functional limitations (i.e., very serious interference with functioning) or two
areas of marked limitation (i.e., serious interference with functioning). Id.

                              DISCUSSION

The administrative law judge (ALJ) found that the child suffered from
attention deficit hyperactivity disorder (ADHD). (Tr. 11). It was determined that the
condition did not meet, medically equal or functionally equal any Listing of
Impairments section. (Tr. 16-17). Thus, benefits were denied. (Tr. 17).

As part of his decision that the plaintiff's conditions did not functionally equal
the Listing of Impairments section, the ALJ determined that the plaintiff had only one
"marked" limitation (i.e., attending and completing tasks) and no "extreme"

2

limitations. Because information concerning "interacting and relating with others" was not adequately accessed, the case must be remanded.

According to the text of the ALJ's decision itself, the "interacting and relating with others" domain involves emotional connections with others, using the community's language, cooperating with others, responding to criticism and taking care of the possessions of others. (Tr. 15). As noted supra, serious interference with these functions is all that is required to constitute a "marked" impairment.

As of the time of a March, 2001 school psychological evaluation after reported difficulties in behavior in the classroom and failing a speech language evaluation (Tr. 149), Gary's social/communication and personal living skills were characterized as "well below average." (Tr. 140). His overall adaptive behavior, although he was a bit over six years old, was that of someone three years and seven months old. (Tr. 138, 141). He was said to disobey the teacher, leave the building or room without permission, and be unable to function in a large group. (Tr. 142). He was overactive and distractible. (Tr. 145). His frustration tolerance was poor and his emotional tone was immature. (Tr. 146). His reading skills were in the low average to average range (Tr. 144), however, information and vocabulary were borderline (Tr. 146).

Gary, who had been referred to the Mountain Comprehensive Care Center (MCCC) at age 2 for speech delays (Tr. 223), was again referred to the facility in

mid-2001 for being disruptive, aggressive and noncompliant at school (Tr. 219). Diagnoses of ADHD, a phonological disorder and a parent-child relational problem were made. (Tr. 202).

The same diagnoses were again made in February, 2003 at the facility, when regular treatment began. At first, the plaintiff was still hyperactive, but his grades were "As" and "Bs." (Tr. 194). The child reportedly improved over the summer, but was still "hyper," "fidgety" and "into everything" when in the office. (Tr. 189, 190, 191). When school resumed, he was reportedly kicked off the school bus for fighting, and giving teachers a difficult time. (Tr. 187). As of December, he was "very hyper" and fidgety at the office and still a behavior problem at school. (Tr. 186). Early the next year, despite medication, he was fidgety and could not keep his hands to himself (Tr. 184) and his grades were falling (Tr. 183).

Meanwhile, school records show that testing in May of 2003 revealed reading composite scores at the third national percentile and language composite scores at the first national percentile. (Tr. 104). Two months later, his teacher rated him as "very often" failing to pay attention to details or making careless mistakes, sustaining attention in tasks, fidgeting or climbing excessively, blurting out answers, losing his temper, not following instructions or finishing his work and initiating physical fights. (Tr. 155-156).

4

Slone for Herald

Later that year, in October, 2003, the 8 year old child underwent a consultative psychological evaluation by Phil Pack. (Tr. 157). At that time he was receiving special reading classes and speech therapy at school and had been seen by a child psychiatrist at the MCCC for about a year. (Tr. 158). Doug exhibited, according to Pack, significant symptoms of behavioral impulsivity and overactivity during the interview and testing. (Tr. 159). There was also said to be a somewhat oppositional quality to his interaction and he would not cooperate on certain tasks. (Id.). The examiner felt that while he cognitively had the ability to function at grade level, his difficulties (including only kindergarten level reading ability)[1] were behaviorally oriented. (Tr. 160, 161).

At this point, the record was apparently seen by an agency medical reviewer, Jane Brake. Brake noted that Pack's report showed that the child definitely showed "marked problems with tasks focus, even on meds." (Tr. 162). She did not, at that time, discuss other functional domains explicitly. It is also unclear what teacher questionnaires she may have seen, given her reference to the lack of such questionnaires. (Id.; see Tr. 155-156). At any rate, she recommended a speech consultative examination.

---

[1]School records showed a roughly contemporaneous "Project Read" as "D-" (Tr. 130).

The plaintiff underwent a second consultative examination, this one conducted by Speech/Language Pathologist Kara Kolenda in December, 2003. The examiner noted that the plaintiff was observed to be oppositional toward his mother. (Tr. 163). Hearing screening tests were passed. (Tr. 164). He was poorly able to participate in spontaneous conversation and his reading was not functional for completion of tasks within the classroom or community. (Tr. 165). According to the examiner, the communication deficits would likely have a severe impact on academic functioning and may have some affect on social skills. (Tr. 166).

In January/February, 2004, Gary underwent an additional school-ordered psychological examination and testing. Adaptive behavior in social/communication and community living were described as "limited" (Tr. 228); his social communications skills as an 8 year old were comparable to an individual aged 5 years and 5 months (Tr. 229). Personal living skills were comparable to an individual aged 6 years and 2 months. (Tr. 230). He exhibited very serious problem behaviors such as uncooperative behavior and destructiveness to property. (Tr. 231). Word reading was at first grade and spelling was at the kindergarten level. (Tr. 233). His mathematical skills were in the extremely low range. (Tr. 235). He was described as fidgety in class and exhibiting an immature emotional tone to the psychiatrist. (Tr. 241). Information and vocabulary were below average. (Tr. 242). Cognitive ability, as measured by IQ testing, was low average. (Tr. 245). The

scores were considered "much lower and demonstrating continued and severe academic difficulties within his current classroom setting . . . [Gary's] level of maladaptive behaviors would indicate that [Gary] would need extensive support, much more than others his age in order to adequately perform." (Tr. 247).

In March, 2004 an Individual Educational Program was completed for Gary by the school system. His socialization skills and peer relationships were said to have been below that of same age peers. (Tr. 113). He was not able to put his thoughts in sentence form on the same level as same age peers and he did have communications problems characterized by sound substitutions and omissions. (Tr. 113). In the Behavior Management Plan, it was noted that his greatest area of need related to following rules and controlling his outbursts. (Tr. 129).

At this point, two medical reviewers had examined the record and produced evaluation forms. Jane Brake, who had reviewed the record in January, 2003, seeing little beyond the original IEP and consultative examination, found a "marked" impairment in attending and completing tasks and "less than marked" limitations in "acquiring and using information" or "interacting and relating with others." (Tr. 180). Edward Stodola, who reviewed the record in March, 2004, found the same limitations as Brake except for a "less than marked" limitation in "caring for yourself." (Tr. 252). He gave no independent rationale, nor did he discuss the more

7

Slone for Herald

recent IEP, the speech consultative examination or the 2004 psychological examination.

After the last of the medical reviewer's assessments, a Student Discipline Report covering the period from September, 2004 through April, 2005 was introduced. This detailed 23 school infractions, including 7 instances of failing to follow school/class rules, 2 instances of defiance of authority, 4 instances of fighting and 1 instance of theft. (Tr. 132-133). Grades for the 2004-2005 academic year ranged from mainly Ds in spelling, social studies, science and health/practical living (Tr. 135, 136, 137) and unsatisfactory marks in conduct (Tr. 137).

Progress notes from the MCCC show brief periods of improvement (Tr. 277) but still contain numerous comments about fighting with his peers (Tr. 270, 272, 278) or defiance/uncooperativeness (Tr. 272, 275).

Unfortunately for the Commissioner, Stodola (the only medical reviewer to have seen any of the wealth of information after October, 2003 such as the consultative speech/language examination, many school records including the early 2004 psychological report) did not detail any independent reasoning. This, despite the 2004 report's reference to lower scores, "severe academic difficulties" and maladaptive behavior (Tr. 247) and Kara Kolenda's comment that communications deficits would have a severe impact on academic functioning, and much other information suggesting serious communication and behavioral difficulties.

8

Slone for Herald

The case must be remanded for reanalysis of the "interacting and relating with others" functional domaine.

This the ___2___ day of August, 2006.


_Ashley Unthank_
G. WIX UNTHANK
SENIOR JUDGE